In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 07-4080, 08-1030, 08-1072, 08-1106

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CONRAD M. BLACK, PETER Y. ATKINSON, JOHN A.
BOULTBEE, and MARK S. KIPNIS,

*Defendants-Appellants*.

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 727—**Amy J. St. Eve**, *Judge*.

———————

ARGUED JUNE 5, 2008—DECIDED JUNE 25, 2008

———————

Before POSNER, KANNE, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. At the end of a four-month trial,
the jury convicted the defendants of mail and wire fraud
in violation of 18 U.S.C. § 1341 and Black in addition of
obstruction of justice in violation of 18 U.S.C. § 1512(c). The
judge sentenced him to 78 months in prison, Atkinson
and Boultbee to 24 and 27 months, and Kipnis to proba-
tion with six months of home detention.

The defendants were senior executives (Black was the
CEO) of an American company called Hollinger Inter-

national, which through subsidiaries owns a number of newspapers here and abroad. It was controlled by a Canadian company, since defunct, called Ravelston, which in turn was controlled by Black, who owned 65 percent of its shares. (In between Hollinger and Ravelston was a holding company that we can ignore.) Black effectively controlled Hollinger through his majority stake in Ravelston. He owned some stock in Hollinger, but a much higher percentage of the stock of Ravelston, in which Atkinson and Boultbee also owned stock. So it was in his and their financial interest to funnel income received by Hollinger to Ravelston. This was done by Hollinger's paying large management fees to Ravelston.

Hollinger had a subsidiary called APC, which owned a number of newspapers that it was in the process of selling. When it had only one left—a weekly community newspaper in Mammoth Lake, California (population 7,093 in 2000, the year before the fraud)—defendant Kipnis, Hollinger's general counsel, prepared and signed on behalf of APC an agreement to pay the other defendants, plus David Radler, another Hollinger executive and a major shareholder in Ravelston, a total of $5.5 million in exchange for their promising not to compete with APC for three years after they stopped working for Hollinger. The money was paid. Neither Hollinger's audit committee, which was required to approve transactions between Hollinger's executives and the company or its subsidiaries because of conflict-of-interest concerns, nor Hollinger's board of directors, was informed of this transaction. Or so the jury was entitled to find; the evidence was conflicting.

That Black and the others would start a newspaper in Mammoth Lake to compete with APC's tiny newspaper

there was ridiculous. But the defendants argue that really the $5.5 million represented management fees owed Ravelston and that they had characterized the fees as compensation for granting covenants not to compete in the hope that Canada might not treat the fees as taxable income. Although Hollinger is a large, sophisticated, public corporation, no document was found to indicate that the $5.5 million in payments was ever approved by the corporation or credited to the management-fees account on its books. The checks were drawn on APC, though the evidence was that the defendants had no right to management fees from that entity, and were backdated to the year in which APC had sold most of its newspapers. The purpose of the backdating was—or so the jury could find—to make the compensation for the covenants not to compete seem less preposterous. And while management fees were supposed to be paid to *Ravelston* as well as from a management-fee account, the payments were made to the defendants personally and came from the proceeds of a newspaper sale, facts that increase the implausibility of supposing that these direct payments to the defendants were a means of discharging a debt owed them by Hollinger. It is true that Radler, who pleaded guilty and testified for the government, said that he thought the audit committee had approved the so-called management fees. But the members of the committee testified otherwise and the jury was entitled to believe them.

There is more. The defendants failed to disclose the $5.5 million in payments in the 10-K reports that they were required to file annually with the Securities and Exchange Commission. And they caused Hollinger to represent to its shareholders falsely that the payments had been made "to satisfy a closing condition."

There was still more evidence of the fraud, but there is no need to go into it. The jury convicted the defendants of a second, similar fraud, on equally compelling evidence; there is no need to extend the opinion with a discussion of that either.

The evidence established a conventional fraud, that is, a theft of money or other property from Hollinger by misrepresentations and misleading omissions amounting to fraud, in violation of 18 U.S.C. § 1341. *United States v. Orsburn*, 525 F.3d 543, 545-46 (7th Cir. 2008). But the jury was also instructed that it could convict the defendants upon proof that they had schemed to deprive Hollinger and its shareholders "of their intangible right to the honest services of the corporate officers, directors or controlling shareholders of Hollinger," provided the objective of the scheme was "private gain." That instruction is the focus of the appeals.

Section 1346 of the federal criminal code, added in 1988 in order to overrule *McNally v. United States*, 483 U.S. 350 (1987), defines "scheme or artifice to defraud" in section 1341 to include a scheme or artifice to "deprive another of the intangible right of honest services." The defendants do not deny that Hollinger was entitled to their honest services. They were senior executives of Hollinger and owed the corporation fiduciary obligations, implying duties of loyalty and candor. It is not as if Black had merely been using his power as controlling shareholder to elect a rubber-stamp board of directors or to approve a merger favorable to him at the expense of the minority shareholders. He was acting in his capacity as the CEO of Hollinger when he ordered Kipnis to draft the covenants not to compete and when he duped the audit committee and submitted a false 10-K. On his own theory, the fees that he collected, which the jury was entitled to

find were never owed to him, were management fees rather than dividends. The defendants' unauthorized appropriation of $5.5 million belonging to a subsidiary of Hollinger was a misuse of their positions in Hollinger for private gain, which is just the kind of conduct that we said in *United States v. Bloom*, 149 F.3d 649, 655-57 (7th Cir. 1998), was the essence of honest services fraud. See also *United States v. Hausmann*, 345 F.3d 952, 955-57 (7th Cir. 2003); *United States v. Rybicki*, 354 F.3d 124, 141-42 (2d Cir. 2003) (en banc).

So if the jury found such a misappropriation, this would mean that the defendants, having both deprived their employer of its right to their honest services and obtained money from it as a result, were guilty of both types of fraud. *United States v. Turner*, 465 F.3d 667, 678-79 (6th Cir. 2006); *United States v. Caldwell*, 302 F.3d 399, 408 (5th Cir. 2002). Nothing is more common than for the same conduct to violate more than one criminal statute. But the section 1346 instruction, which we quoted, did not require that the jury find that the defendants had taken any money or property from Hollinger; all it had to find to support a conviction for honest services fraud was that the defendants had deliberately failed to render honest services to Hollinger and had done so to obtain a private gain. The defendants do not deny that they sought a private gain. But they presented evidence that it was intended to be a gain purely at the expense of the Canadian government. They argue that for the statute to be violated, the private gain must be at the expense of the persons (or other entities) to whom the defendants owed their honest services—a group not argued to include the Canadian government.

They are making a no harm-no foul argument, and such arguments usually fare badly in criminal cases. Suppose

your employer owes you $100 but balks at paying, so you help yourself to the money from the cash register. That is theft, e.g., *State v. Winston*, 295 S.E.2d 46, 51 (W. Va. 1982); *Edwards v. State*, 181 N.W.2d 383, 387-88 (Wis. 1970); *State v. Self*, 713 P.2d 142, 144 (Wash. App. 1986), even though if the employer really owes you the money you have not harmed him. You are punishable because you are not entitled to take the law into your own hands. Harmlessness is rarely a defense to a criminal charge; if you embezzle money from your employer and replace it (with interest!) before the embezzlement is detected, you still are guilty of embezzlement.

The application of this principle to honest services mail and wire fraud is straightforward. As explained in *United States v. Orsburn*, *supra*, 525 F.3d at 546, section 1346 was added "to deal with people who took cash from third parties (via bribes or kickbacks). *United States v. Holzer*, 816 F.2d 304 (7th Cir. 1987), supplies a good example. Judge Holzer accepted bribes from litigants. What he took from his employer, the state's judicial system, was the honest adjudication service that the public thought it was purchasing in exchange for his salary." See also *United States v. Sorich*, 523 F.3d 702, 707-08 (7th Cir. 2008); *United States v. Thompson*, 484 F.3d 877, 884 (7th Cir. 2007); *Man-Seok Choe v. Torres*, 525 F.3d 733, 737 (9th Cir. 2008); *United States v. Kemp*, 500 F.3d 257, 279-80 (3d Cir. 2007); *United States v. Rybicki*, *supra*, 354 F.3d at 139-42. Similarly, if the defendants in this case deprived their employer, Hollinger, of the honest services they owed it, the fact that the inducement was the anticipation of money from a third party (the anticipated tax benefit) is no defense.

This case is different from those we have cited because Canada was not bribing the defendants with the offer of a tax benefit. But the distinction is unrelated to anything in the text or purpose of section 1346. The grant of a tax benefit is a purposive act, which confers a benefit on the grantor just as a voluntary transfer of money or property to him does; in fact it *is* a voluntary transfer of money. The defendants do not argue that they were trying to defraud Canada; they argue that their recharacterization of management fees as compensation for granting covenants not to compete was proper under Canadian tax law, even if the receipt of the payments violated American law. Canada, they contend in effect, was willing to "pay" the defendants in the form of a tax benefit in order to advance Canadian policy.

And if the defendants were trying to defraud Canada, that augmentation of their wrongdoing would not help their case. Suppose a third party gives a bribe to a buyer for a department store, and the buyer pockets the bribe but does not carry out his side of the bargain, which was that he would purchase supplies from the principal of the person who bribed him. The buyer has deprived his employer (the department store) of his honest services, and has done so for private gain, but he has conferred no benefit on a third party. Judges who accept bribes invariably argue that they didn't allow the bribes to influence their decisions. But a judge who accepts bribes deprives the judiciary of his honest services even if, as contended by Francis Bacon, the most famous of corrupt judges, he does nothing for the person who bribed him. Such a case does not differ materially from that of the "honest" recipient of a bribe—the recipient who, committed to honor among thieves, performs his side of the illegal bargain.

Notice, too, how honest services fraud bleeds into money or property fraud. In the procurement case, the eagerness of the seller's agent to make a sale might enable the purchasing agent to negotiate a better price, to the financial benefit of his employer; instead he takes the "better price" in the form of a bribe. In this case, had the defendants disclosed to Hollinger's audit committee and board of directors that the recharacterization of management fees would net the defendants a higher after-tax income, the committee or the board might have decided that this increase in the value of the fees to them warranted a reduction in the size of the fees. If $10 in tax-free income is worth $15 to the recipient in taxed income, the employer who learns about the tax break may require the employee to accept in tax-free income less than $15 in taxed income.

This is not to say that every corporate employee must advise his employer of his tax status. But the defendants had a duty of candor in the conflict-of-interest situation in which they found themselves. Instead of coming clean they caused their corporation to make false filings with the SEC, and they did so for their private gain. Such conduct is bound to get a corporation into trouble with the third party and the SEC.

Even if our analysis of honest services fraud is wrong, the defendants cannot prevail. There is no doubt that the defendants received money from APC and very little doubt that they deprived Hollinger of their honest services; whether they also got (or hoped to get) a tax break from the Canadian government was not an issue at trial, as the defendants acknowledged, albeit backhandedly, when they said in their reply brief in this court that the theory "that defendants 'misused' their

positions at [Hollinger] for personal gain in the form of Canadian tax benefits" was "the very theory the government propounded *up to the eve of trial*" (emphasis added). It was not the government's theory at trial.

The defendants point out that *Yates v. United States*, 354 U.S. 298 (1957), held that if the instructions permit the jury to convict of a nonexistent crime, the fact that they also permit it to convict of a genuine crime will not save a conviction declared in a general verdict. *United States v. Sorich*, *supra*, 523 F.3d at 706. That is different from a case in which two correct theories of illegality are presented in the instructions and there is sufficient evidence to convict only on one; the jury is assumed to have followed the instruction on the government's burden of proof and therefore to have rejected the insufficiently supported theory. *Griffin v. United States*, 502 U.S. 46, 59-60 (1991); *Tenner v. Gilmore*, 184 F.3d 608, 611 (7th Cir. 1999). But a jury that is given an illegal instruction cannot be assumed not to have followed it, since juries are neither authorized nor competent to make judgments of law.

An error in jury instructions is subject to the harmless-error doctrine. E.g., *Pope v. Illinois*, 481 U.S. 497, 502-03 (1987); *United States v. Ramsey*, 406 F.3d 426, 432 (7th Cir. 2005). Submitting an illegal theory to the jury may or may not be subject to it; it is an issue on which the courts of appeals are divided. Compare *United States v. Cappas*, 29 F.3d 1187, 1192-93 (7th Cir. 1994), and *United States v. Holly*, 488 F.3d 1298, 1305-06 n. 3 (10th Cir. 2007), with *Lara v. Ryan*, 455 F.3d 1080, 1085 (9th Cir. 2006), and *United States v. Edwards*, 303 F.3d 606, 641-42 (5th Cir. 2002). But giving an instruction that omits a qualification required to make it unambiguously correct is dif-

ferent from submitting a case to a jury on an erroneous theory of criminal liability. The prosecution did not ask the jury to convict the defendants because their private gain was at Canada's expense. The government's honest services theory was straightforward. It was that the defendants had abused their positions with Hollinger to line their pockets with phony management fees disguised as compensation for covenants not to compete. Had the jury believed that the payments for the covenants not to compete were actually management fees owed the defendants, as the defendants argued, it would have acquitted them.

If the jury had been given a special verdict that separated the two types of fraud, and had indicated on the verdict that the defendants were not guilty of an honest services fraud, the challenge to the instruction would be moot. The defendants were not required to request a special verdict. But there is a wrinkle in this case that shows they forfeited their objection to the instruction: the *government* requested a verdict that would require the jury to make separate findings on money or property fraud and on honest services fraud. The defendants objected—they wanted a general verdict. In effect, they wanted to reserve the right to make the kind of challenge they are mounting in this court.

They are reduced to arguing that the judge *after* receiving the verdict should have told the jury to determine whether it had found both a money or property fraud and an honest services fraud. That procedure was tentatively approved by the Third Circuit in *United States v. Riccobene*, 709 F.2d 214, 228 n. 19 (3d Cir. 1983), although that court has since made clear that it is better to give the jurors the interrogatories on the same form as the

verdict. *United States v. Hedgepeth*, 434 F.3d 609, 613-14 (3d Cir. 2006). Questioning the jurors after they have handed down their verdict is not a good procedure and certainly not one that a district judge is *required* to employ; nor has the Third Circuit so suggested. The defendants' proposal could if adopted create a nightmare in which the jury renders a general verdict; the jurors are polled and think they're about to be released from their term of indentured servitude—here four months—and be free to get on with their lives; and then they are told they must take an exam so that the judges and lawyers can know exactly how they evaluated the various theories presented to them in the instructions. Must they resume deliberations? And if they disagree, what then—an *Allen* charge?

We turn to the obstruction of justice charge against Black. The charge is that he concealed or attempted to conceal documents "with the intent to impair the [documents'] integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(c)(1). There was evidence that Black knew that the alleged frauds were being investigated by a grand jury and by the SEC. In the midst of these proceedings Black with the help of his secretary and his chauffeur removed 13 boxes of documents from his office, put them in his car, was driven home, and helped carry them from the car into his house. He later returned them, but no one knows whether the boxes he returned contained all the documents that had been in them when he removed them from his office. It is true that copies were available to the government before the boxes were removed, but it was material to the investigation whether Black had had copies in his office. For that would mean that he had received them, in which event his denials of knowledge of their contents would be undermined.

Anyway, the statute does not require proof of materiality, *United States v. Ortiz*, 367 F. Supp. 2d 536, 542-44 (S.D.N.Y. 2005), affirmed without opinion, 220 Fed. App'x 13 (2d Cir. 2007), for the excellent reason that being able to deny the materiality of a document is the usual reason for concealing the document. All that need be proved is that the document was concealed in order to make it unavailable in an official proceeding. See, e.g., *United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002); *United States v. Lessner*, 498 F.3d 185, 197-98 (3d Cir. 2007); *United States v. Tampas*, 493 F.3d 1291, 1300-01 (11th Cir. 2007). The evidence of that was ample. Black's secretary testified that Black intended to remove the documents to a temporary office that she would set up for him in her home because he had to vacate his office at Hollinger within 10 days. But this testimony was inconsistent with his having put the boxes in his car (not hers, which was at the scene) and taken them home. There was also evidence that in removing the boxes he tried to avoid the surveillance cameras in the building—unsuccessfully.

Three more issues need to be discussed. The first is whether an "ostrich" instruction should have been given. The reference of course is to the legend that ostriches when frightened bury their head in the sand. It is pure legend and a canard on a very distinguished bird. Zoological Society of San Diego, *Birds: Ostrich*, www.sandiegozoo.org/animalbytes/t-ostrich.html (visited June 12, 2008) ("When an ostrich senses danger and cannot run away, it flops to the ground and remains still, with its head and neck flat on the ground in front of it. Because the head and neck are lightly colored, they blend in with the color of the soil. From a distance, it just looks like the ostrich has buried its head in the sand, because

only the body is visible"). It is too late, however, to correct this injustice.

An ostrich instruction tells the jury that to suspect that you are committing a crime and then take steps to avoid confirming the suspicion is the equivalent of intending to commit the crime. E.g., *United States v. Giovannetti,* 919 F.2d 1223, 1228 (7th Cir. 1990). Suppose you *think* you've rented your house to a drug gang, but to avoid confirming your supposition you make sure not to drive near the house, where you might observe signs of drug activity. That would be the equivalent of knowledge that you had rented the house to the gang. It would be a case of *physical* avoidance of confirmation of one's suspicions but there is also *psychological* avoidance, which is the type alleged here and which requires the jury's "distinguishing between a defendant's mental effort of cutting off curiosity, which would support an ostrich instruction, and a defendant's simple lack of mental effort, or lack of curiosity, which would not support an ostrich instruction." *United States v. Carrillo*, 435 F.3d 767, 780 (7th Cir. 2006). It is the distinction between willful ignorance and ordinary ignorance.

The defendants argue that either they knew they were taking money that they were not entitled to, or they were entitled to it; there is no middle ground. But there is. Remember that the defendants received the payments in question not from Hollinger but from APC, which the evidence showed did not owe them any management fees. If you receive a check in the mail for $1 million that you have no reason to think you're entitled to, you cannot just deposit it and when prosecuted for theft say you didn't know you weren't entitled to the money—that it might have been a random gift from an eccentric billion-

aire. You would have strongly suspected that you weren't entitled to the money and you would therefore have a duty to investigate. By shutting your eyes you tacitly confessed your all-but-certain knowledge that you were stealing the money. *United States v. Orsburn*, *supra*, 525 F.3d at 545 ("The embezzled funds were roughly twice the couple's legitimate income, and they spent it all. Michael could hardly avoid noticing this sudden improvement in the couple's fortunes even if he never looked at bank statements"); *United States v. Rogers*, 289 F.2d 433, 438 (4th Cir. 1961); 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.2(g), pp. 71-72 (2d ed. 2003).

The defendants argue that the judge gave an inadequate limiting instruction with respect to the jury's use of the false filings with the SEC. The instruction, although correct, was abrupt: "You have heard evidence in this case regarding the disclosures of non-competition payments in Hollinger International's quarterly and annual reports and proxy statements in 2001 and 2002. The defendants in this case are not charged with securities fraud." It was important for the jury to understand that it could use the false filings to infer that the defendants had been trying to conceal their receipt of the payments but that the filings themselves were not charged as crimes.

The defendants proposed a misleading instruction as an alternative. It substituted for the second sentence ("The defendants in this case are not charged with securities fraud") the following: "The defendants are not charged with making false or misleading statements in these filings, and you may not conclude that a defendant is guilty of mail or wire fraud based on any alleged false statements or omissions in any of these filings." The defendants *were* "charged," in the sense of accused, of

making false statements in these filings. And the jury *was* entitled to base a judgment of guilt "on any alleged false statements or omissions in any of these filings," provided that the false statement or omission was material to the alleged mail or wire fraud. At argument, the lawyer who had proposed the instruction told us at first that he had made other, oral submissions as well. But when reminded that he had said in his brief that he had "proposed a series of limiting instructions, culminating with this request for the final charge"—the proposed instruction that we quoted—he backed off.

If one party submits an instruction that is accurate but could be made clearer, and the other party submits a misleading instruction, the judge can go with the first instruction. Not that the cases require "that a submitted charge be technically perfect to alert the court to the need for a particular charge." *Bueno v. City of Donna*, 714 F.2d 484, 490 (5th Cir. 1983); see also *Wilson v. Maritime Overseas Corp.*, 150 F.3d 1, 9-10 (1st Cir. 1998). But given the number and skill of the defendants' lawyers, the misleading character of their proposed instruction cannot be regarded as a merely "technical" failing, as opposed to an effort to mislead. Nor was the judge's instruction erroneous; it was merely terse.

Defendant Kipnis, the least culpable of the defendants, as indicated by the light sentence he received (though any felony conviction is likely to be devastating for a lawyer), complains that he should have been acquitted because he knew nothing about the management fees and had nothing to gain from the fraud. The last point has no merit, since Black controlled Hollinger and therefore held Kipnis's fate in his hands. The first two points are really just one point, with respect to which the ostrich instruc-

tion was decisive. It was he who prepared the agreement that purported to grant covenants not to compete in exchange for $5.5 million. He knew that the covenants made no sense, since APC was on its way out of the newspaper business and the other grantors of the covenants not to compete were not about to leave Hollinger to start a newspaper in Mammoth Lake. The jury was entitled to infer that Kipnis suspected a fraud, which he facilitated by his preparation of the agreement, but asked no questions lest his suspicion rise to a certainty. He buried his head in the sand.

The defendants raise some other points in their 161 pages of briefs, but none that has sufficient merit to require discussion. The judgments are

AFFIRMED.