In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3216

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BEATRICZ RAMIREZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cr-00809-5—**John W. Darrah**, *Judge.*

ARGUED FEBRUARY 27, 2009—DECIDED AUGUST 3, 2009

Before MANION, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Beatricz Ramirez was charged with one count of wire fraud in violation of 18 U.S.C. § 1343. Following a jury trial, she was convicted. She was sentenced to a term of imprisonment of 18 months and ordered to pay restitution. Ramirez appealed her conviction, arguing that the district court erred by giving the jury an ostrich instruction and by refusing to include language stating that mere negligence did not

support a finding of knowledge. For the following reasons, we affirm.

## I. BACKGROUND

Luis Uribe was a successful mortgage broker for Freedom Mortgage in the Elgin, Illinois area. But his legitimate success was not good enough for him. So he devised a fraudulent mortgage scheme, using the identities of former clients with good credit to obtain mortgage financing for persons who could not qualify for mortgages and padding his wallet in the process. The scheme basically worked like this: A person with poor or no credit would find a house he or she wanted to buy, and Uribe used the name and identifiers of another person in negotiating the purchase contract and applying for financing. Sometimes the names and identifiers used were those of various individuals, including Jorge Itoralde, Griselda Sanchez, and Uribe's brother, Carlos, who agreed to sell their credit histories to non-qualifying buyers. On other occasions, Uribe used the names and identifiers he had stolen from former clients. Then he arranged for someone to use a fake identification card in the name of the person whose identity had been stolen to pose as the buyer at the closing. After the closing, the person with poor or no credit would move into the house and try to make the mortgage payments. The record does not disclose that the title to the property was ever passed to that person.

Uribe did business with Beatricz Ramirez, a licensed real estate agent, over a three-year period beginning in 2003.

Ramirez began working as a realtor for Starck Realty in Elgin, Illinois in about October 2003. (She had worked a short time as a realtor for another office prior to that.) She was trained about a real estate agent's responsibilities, including how to fill out contracts. Between April and mid-July of 2005, Ramirez acted as the buyer's agent in seven fraudulent transactions that were part of Uribe's scheme.

The only issue at trial was whether Ramirez knowingly participated in the scheme.[1] To establish knowing participation, the government presented the testimony of Uribe; the testimony of Rafael Cruz, another participant in the scheme; statements by Ramirez to the FBI during its investigation of the fraud; Ramirez's grand jury testimony; and evidence of numerous suspicious circumstances surrounding the fraudulent transactions. Ramirez testified at trial on her behalf and denied knowingly participating in the scheme.

Uribe, who was cooperating with the government, testified that when he had a client for whom he was going to apply for a fraudulent loan and who had not yet found a home, he referred him or her to Ramirez.

---

[1] She conceded the existence of the fraudulent scheme and stipulated that on or about August 31, 2005, a truth-in-lending disclosure statement purportedly signed by Maria Moreno, an interstate wire communication, was faxed from Illinois to First NLC Financial Services LLC in Deerfield Beach, Florida. This communication was the basis for the wire-fraud count with which she was charged.

According to Uribe, both he and the persons referred informed Ramirez that these individuals could not qualify for financing in their own names. Ramirez worked directly with these buyers, showing them houses, and thus knew their names. Once the buyer found a house he or she wanted to live in, Ramirez filled out a form real estate purchase contract. At first, Ramirez filled in the buyer's name, and Uribe would return it to her crossed or whited out. Eventually he asked her for blank purchase contract forms, indicating to her, he claims, that the title companies were complaining about the changes in the contracts. Ramirez complied and gave him blank contract forms. Then Uribe filled in the blanks with the name of the person whose identity he had stolen and returned the completed contract to Ramirez to provide to the seller or listing agent. The name of the person to whom Ramirez showed the house and whom she knew would live in the house did not appear anywhere on the purchase contract.

Uribe testified that Ramirez asked him where he was getting the identities he used to obtain the fraudulent loans, and he told her that he was using the names and identities of former clients as the purported buyers. He also testified that he told Ramirez that a third person with fake identification in the name of the former client would attend the closing and sign as the purported buyer. Uribe claimed that Ramirez asked him how he was able to get so many mortgage applications using one person's identity, and he told her that as long as the loans closed within a thirty- to sixty-day period of each other, several closings could take place with the same

identity—credit reports were not updated in a shorter time period. Uribe also testified that he had a few conversations with Ramirez in which she expressed concern over the fraudulent loan transactions. According to Uribe, she indicated that she knew what he was doing was not right and questioned him whether he knew what he was doing.

Uribe further testified that he instructed Ramirez to negotiate a seller's concession, which required the seller to pay a specified amount purportedly toward closing costs, in the purchase contracts. He said that he explained to her that the concession was necessary to pay his commission and to pay the persons who attended the closings posing as the purported buyers, including Rafael Cruz. According to Uribe, Ramirez said that was fine with her. The evidence was that Ramirez did, in fact, negotiate seller's concessions in the purchase contracts involved in some of the seven fraudulent transactions for which she was the buyer's agent, including a house at 1365 Kaskaskia. (And, in fact, Ramirez even admitted that she negotiated the seller's concession on the Kaskaskia property.)

Cooperating witness Rafael Cruz testified that he met Uribe in 2004 when Cruz refinanced his home. Cruz wanted to buy a new home, so he returned to Uribe. Uribe told Cruz that he could not qualify for a loan but indicated that he could help Cruz get a loan—at a cost. Cruz understood that he would pay someone to sign the contracts for him. Uribe referred Cruz to Ramirez to find a home. Ramirez showed properties to Cruz and his

wife, Juana Angelito, and they decided to buy one at 286 Chaparral. Uribe applied for a mortgage loan for the property in the name of Jorge Itoralde, who had agreed to sell his credit history. Itoralde attended the closing for 286 Chaparral and signed the contracts in his own name. Uribe testified that Ramirez knew that Uribe applied for the mortgage using Itoralde's name because Uribe told her so and because she knew that Cruz paid Itoralde $5,000 for the use of his name and identity—Cruz had complained to her about how much he had to pay Itoralde.

In early 2005 Uribe asked Cruz if he would be able to obtain fake IDs, using names and identifiers Uribe would provide. Uribe also asked Cruz to attend real estate closings posing as the persons whose names would appear on the fake IDs and contracts. Cruz agreed to do so. Cruz attended at least three closings posing as Luis Gonzalez, a former client of Uribe's whose identity Uribe had stolen. Cruz testified at trial that the first Gonzalez closing involved a property at 212 Hill, which he believed was purchased by two young people. Cruz said that Uribe drove him to the closing and on the way, they discussed that Ramirez would be there. Uribe told Cruz that he would advise Ramirez that Cruz was posing as Gonzalez because she already knew Cruz from helping him find his home at 286 Chaparral. Uribe testified that he did, in fact, tell Ramirez that Cruz would be posing as Gonzalez, and she laughed and said something like "as long as the documents match and the IDs match," it was fine with her. Cruz testified that Ramirez arrived late at the closing on 212 Hill, but was in time to see him sign the closing documents.

Ramirez, however, testified at trial that she did not attend the closing for 212 Hill. She also testified that the buyers were Alejandro Cano and his wife, not the "two young persons," as claimed by Cruz. Ramirez stated that she prepared the purchase contract for the Canos and then sent it to the selling agent for approval. The contract was approved. After receiving the signed contract from the seller, Ramirez forwarded it to the attorney as well as the lender, Uribe. She explained that Uribe had referred the Canos to her. She subsequently received a letter, dated May 12, 2005, from the Canos' lawyer, Salvador Lopez, indicating that there had been a change in the buyer and that the buyer was Luis Gonzalez.

The second Gonzalez closing involved a property at 1238 Surrey. Ramirez showed the home to Alejandro Espinoza and another young male. Uribe testified that Ramirez attended the closing on 1238 Surrey. Ramirez testified that she arrived late at the closing, but admitted that she saw Cruz in the room where the closing took place. She also testified that after the closing, she received a call from Cruz, who said, "I'm Rafael Cruz, Luis Gonzalez, or whoever I'm supposed to be."

The third Gonzalez closing, which took place in June 2005, involved a property at 386 Vincent Place. Ramirez showed this property to Dennis Davis, an individual she had met at a shopping mall while looking for sunglasses. At trial Ramirez admitted that she referred Davis to Uribe for a loan and discussed with him that if he did not qualify for a loan, Uribe could find someone to

assist him, what she referred to as a "co-signer." Ramirez explained that she understood a "co-signer" to be someone who signed for a property on behalf of the person who would live there. She claimed not to know that there was anything wrong in telling him that. Ramirez admitted that she attended the closing for 386 Vincent Place, but again claimed to have arrived late. But she also admitted that she saw Cruz at the closing and that she knew, *at the closing*, that Cruz was claiming to be Luis Gonzalez.

Jose Bahena testified at trial that he had discussed purchasing a home with Uribe who told him that he could not get a loan in his own name. Uribe also told Bahena that Uribe could get him a loan anyway—Uribe would get a co-signer. Bahena said that Ramirez showed him a house at 1365 Kaskaskia, which he liked, so she told him to get together with Uribe to get a loan. The contract date on the purchase contract for 1365 Kaskaskia was July 14, 2005. Bahena testified that he contacted Uribe and eventually attended a closing for the property. Bahena said that Uribe and Maria Moreno, his co-signer, also attended the closing, but Ramirez did not. Bahena testified to his understanding that both he and Moreno would sign the closing papers and that he was supposed to pay her $1,000 for helping him. However, Bahena said that he did not sign any papers at the closing. Uribe had told him that he did not qualify and only Moreno qualified. After the closing Bahena met Ramirez to obtain the keys to the house.

FBI Special Agent Brian E. Smith testified that during the summer of 2006 he was involved in an investigation

of mortgage fraud in the Elgin, Illinois area. In the course of his investigation he determined that Ramirez was the realtor on seven of twenty-one properties he had identified as having been obtained with fraudulent mortgages. Smith interviewed Ramirez in June 2006. Ramirez told Smith that Luis Uribe was a mortgage broker who referred clients to her—in fact, in 2005 the majority of Ramirez's referrals were from Uribe—and she referred clients to him. She said that she had done approximately 33 properties with Uribe over a two-year period and had attended between eight and ten closings with him. Ramirez admitted that she found homes for persons she knew could not qualify for mortgages—persons referred by Uribe. She also told Smith that co-signers purchased the properties and the persons living in the homes paid the mortgages. Ramirez advised the agent that she earned two and one-half percent commission on the sales price of the homes on which she worked with Uribe.

Ramirez indicated to Agent Smith that in the beginning she filled out the purchase contracts with the information she received from Uribe on the persons who wanted to buy a property. However, because those persons did not qualify, the title company was getting frustrated with the changes in the contracts, and Uribe therefore asked for blank contracts, which she gave him. Ramirez also said that Uribe had told her that credit reports were updated every 60 to 90 days or so and that multiple properties purchased would not show up within that time period. Before interviewing Ramirez, Agent Smith had been unable to identify who had obtained the

stolen IDs used in the mortgage scheme. Ramirez identified Cruz as the person who did that.

Agent Smith testified that Ramirez told him that she attended at least three closings where Cruz signed as Gonzalez. Smith inquired about a property at 1238 Surrey Road, and Ramirez told him that it was one of the properties for which Cruz signed as Gonzalez. Ramirez also said that Gonzalez's address on the contract for 1238 Surrey was listed as 212 Hill. And Ramirez volunteered to Smith that she attended the closing for 212 Hill and again saw Cruz sign as Gonzalez. Agent Smith asked Ramirez about 1365 Kaskaskia, and she told him that she found that property for someone named Bahena. Smith told her that the named buyer on the property was Maria Moreno, and Ramirez volunteered that if it was Maria Moreno, it wasn't the real Maria Moreno because Uribe had other people signing and posing as Maria Moreno. Ramirez offered that Cruz's wife, sister or girlfriend, she wasn't sure which, had signed as Maria Moreno and another purported buyer, Olga Trejo.

Ramirez also told Agent Smith that she had gone to the mall to purchase sunglasses and met a person who had poor or no credit, but wanted to buy a home. According to Smith, Ramirez said that she told the man that she had a friend, Luis Uribe, who could find a co-signer to buy the property for him at the cost of $1,500. Ramirez advised Smith that she found this person a home and attended the closing. Agent Smith determined through his investigation that the property was 386 Vincent Place, with a purchase contract date of April 19, 2005, and that the purported buyer was Luis Gonzalez.

As mentioned, Ramirez testified before the grand jury. The government read the transcript of her grand jury testimony at trial. Ramirez's grand jury testimony repeated much of what she had said during Agent Smith's interview. She testified that over the past two years she did approximately 33 real-estate sales transactions with Luis Uribe for which she was the real estate agent for the buyers of the properties. She admitted that for all of the properties, her buyer was supposed to live in the property and pay the mortgage, but another person's name was on the mortgage; that she would send Uribe contracts and he would let her know that the person did not qualify and he needed another person's name on the contract; that as the realtor it normally was her responsibility to write up a contract for the property in the name of her buyer; and that Uribe ultimately requested blank contract forms from her and would fill in the information himself. Ramirez further testified that she attended at least three closings where Cruz showed identification indicating that he was Luis Gonzalez and signed the mortgage contract and title of the property as Gonzalez. She admitted that she knew Cruz wasn't Gonzalez. She also admitted that on one occasion Cruz called her and introduced himself as Rafael Cruz and then corrected himself, saying he was Luis Gonzalez or whoever he was supposed to be. Ramirez further testified that she attended the closing for 386 Vincent Place in June 2005 and believed that was when she learned that Cruz and Gonzalez were not the same person.

Before the grand jury Ramirez also testified that she had a conversation with Uribe in which she said that Luis Gonzalez was buying so many properties so fast, that she couldn't draw up the contracts, and was embarrassed to show the contracts around her office. She said that Uribe had told her not to worry, a person could buy as many properties as he wants, and credit reports are only updated every three months, so the properties would not show up. At trial, Ramirez testified that this conversation had taken place before any of the Gonzalez closings.

Ramirez also testified at trial that she sold Cruz his house at 286 Chaparral and that she knew the house was not purchased in Cruz's name, but was signed for in Jorge Itoralde's name because Cruz could not qualify for a mortgage. She claimed that every time Uribe gave her another person's name, she took it as a "co-signer." Though Ramirez readily admitted that she knew who Cruz was when she saw him at a Gonzalez closing, she was quick to deny that she actually witnessed Cruz sign any closing documents. She offered the explanation that she went to the closing late. But she conceded that she knew the property had been applied for and signed for in Luis Gonzalez's name.

Ramirez testified that she attended the closing on 201 North 9th Street. Olga Trejo was the purported buyer for that property. Ramirez also testified that she attended the closing on 2185 Heather Lane. Co-defendant Griselda Sanchez was the purported buyer for that property. Ramirez denied knowing that Moreno was not going

to be living in these properties. Ramirez explained that she only learned that as a result of the investigation into the mortgage fraud.

At trial Ramirez admitted that some of Uribe's referrals involved purchasing homes in the name of other persons' identities and that she sent him blank contracts so he could fill in the name of the person who would actually sign for the home. She agreed that she had found a home for Jose Bahena at 1365 Kaskaskia, drew up a contract, dated July 14, 2005, which she sent to Uribe, and that he changed it to show Maria Moreno as the buyer. Ramirez also admitted that she did these things knowing that Bahena, not Moreno, would live in the house. Ramirez claimed, however, to believe that Moreno was a co-signer. She also claimed that her testimony before the grand jury and her statement to Agent Smith during his interview that, if 1365 Kaskaskia was purchased in the name of Maria Moreno then it wasn't the real Maria Moreno, was based on a conclusion she had drawn from her awareness about the investigation. She made the same claim with respect to her statement to Agent Smith that she knew Cruz had a woman who lived with him and attending closings, signing as Maria Moreno and Olga Trejo.

Ramirez denied that Uribe instructed her to negotiate a seller's concession and denied that he told her he needed a seller's concession so he and Cruz could get paid. She acknowledged that it was the realtor's responsibility to negotiate any type of seller's concession, however. Ramirez further denied knowing that Uribe would take his commission from the seller's concession, even though she admitted she knew the loans were

100% financed and that the buyers had no cash on hand. And she denied any knowledge of fake IDs. She also denied knowingly participating in a scheme to defraud and she denied ever intending to defraud anyone.

Mary Roberts, the manager of the Starck Realty Elgin, Illinois, office, testified at trial. Roberts had 31 years' experience in real estate and was a licensed agent and broker. She testified that she hired Ramirez in late 2003 and that Starck Realty trains its agents on the importance of accuracy in drawing up sales contracts. Roberts testified about the usual real estate transaction: the real estate buyer's agent would complete the contract with the buyer, have the buyer sign it, and then present it to the listing agent who presents it to the seller, and once the parties reach an agreement, the contract is signed, initialed, dated and provided to the attorneys and lender.

Roberts testified that in September 2005, while covering for Ramirez who was on vacation, she fielded some calls from sellers' agents about Ramirez's transactions. Roberts pulled the files in question and discovered that the same lender and same attorney were involved in each transaction, which alarmed her somewhat. When Ramirez returned, Roberts spoke with her about her concerns about this pattern, asked her if everything was okay, and asked her to use a different attorney or lender. Ramirez responded that everything was okay—she had asked Uribe and he said not to worry, he would take care of her.

Roberts also testified that in 2004—including the time frame of the mortgage scam—Ramirez earned commissions of around $16,000 on written contracts of $700,000 and

in 2005 her earned commissions had climbed to $58,550 on written contracts of approximately $5 million. This made Ramirez the top agent in the Starck Realty Elgin office that year.

## II. ANALYSIS

Ramirez contends that the district court erred in giving the ostrich (conscious or deliberate avoidance) instruction because the government failed to produce any evidence that she deliberately avoided learning the truth. She asserts that the government misused the ostrich instruction in an effort to convince the jury that a reasonable person in her position would have inquired further and discovered the truth. She also complains that the instruction did not include language stating that mere negligence was insufficient to prove knowledge.

### A. Giving the Ostrich Instruction[2]

The district court instructed the jury that to sustain the charge of wire fraud, the government must prove, *inter*

---

[2] As the court recently explained, this instruction derives its name from the incorrect belief "that ostriches when frightened bury their head in the sand." *United States v. Black*, 530 F.3d 596, 604 (7th Cir. 2008), *cert. granted*, 129 S. Ct. 2379 (2009). In truth, when an ostrich senses danger and can't run away, "it flops to the ground and remains still, with its head and neck flat on the ground in front of it" and merely looks as if it has buried its head in the sand. *Id.* (citation omitted).

*alia*, that the defendant "knowingly devised or participated in the scheme to defraud, as described in the indictment." The court further instructed:

> When the phrase "knowingly" is used in these instructions, it means that the defendant realized what he or she was doing and was aware of the nature of his or her conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case.
>
> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut her eyes for fear of what she would learn, you may conclude that she acted knowingly, as I have used the word.

This instruction is substantially the same as Instruction 4.06 of the Federal Criminal Jury Instructions of the Seventh Circuit (1999), but more on the similarity later.

We review the district court's decision to give the ostrich instruction for an abuse of discretion, viewing the evidence in the light most favorable to the government. *United States v. Carani*, 492 F.3d 867, 873 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 932 (2008). Our review is limited, seeking to determine whether the ostrich instruction correctly stated the applicable law. *See United States v. Curry*, 538 F.3d 718, 731 (7th Cir. 2008). It is considered

within the context of all of the instructions as a whole to determine if they adequately and correctly informed the jury of the applicable law. *Id.*

The "ostrich" instruction "explain[s] to the jury that the legal definition of 'knowledge' includes the deliberate avoidance of knowledge." *United States v. Carrillo*, 269 F.3d 761, 769 (7th Cir. 2001); *see also United States v. Severson*, No. 08-1508, 2009 WL 1751545, at *5 (7th Cir. June 23, 2009) (stating that the ostrich instruction "explains to the jury that guilty knowledge also includes the deliberate avoidance of knowledge"); *Black*, 530 F.3d at 604 ("An ostrich instruction tells the jury that to suspect that you are committing a crime and then take steps to avoid confirming the suspicion is the equivalent of intending to commit the crime."). This instruction is appropriate when the defendant claims a lack of guilty knowledge, and the government has presented evidence sufficient for a jury to infer that the defendant deliberately avoided the truth. *Severson*, 2009 WL 1751545, at *5; *Carani*, 492 F.3d at 873. The focus of the instruction is on the defendant, not a reasonable person. *United States v. Carrillo*, 435 F.3d 767, 782 (7th Cir. 2006).

Evidence of deliberate avoidance can be placed in two general categories. The first is physical avoidance, which is where the defendant physically acts to avoid confirming her suspicions. *Black*, 530 F.3d at 604; *Carrillo*, 435 F.3d at 780. Sticking one's head under the hood of a vehicle during a drug deal is an example. *See United States v. Diaz*, 864 F.2d 544, 551 (7th Cir. 1988). The second category of deliberate avoidance is psychological avoidance, which is "a mental act—'a cutting off of one's normal

curiosity by an effort of will.'" *Carrillo*, 435 F.3d at 780 (quoting *United States v. Giovannetti*, 919 F.3d 1223, 1229 (7th Cir. 1990)). An example comes from *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), *cert. denied*, 128 S. Ct. 46 (2007), where the defendant insurance broker was exposed to numerous and obvious red flags throughout a business relationship, was aware of problems with an audit, yet asked no questions and, when confronted with an allegation of insurance fraud, did not disagree. *Id.* at 794-96. Psychological avoidance, which supports an ostrich instruction, is to be distinguished from a defendant's simple lack of mental effort, lack of curiosity, or ordinary ignorance, which does not. *Black*, 530 F.3d at 604; *Carrillo*, 435 F.3d at 780. "The circumstances surrounding the defendant may be sufficient to infer that, given what the defendant knew, [s]he must have forced [her] suspicions aside and deliberately avoided confirming for [herself] that [s]he was engaged in criminal activity." *Carani*, 492 F.3d at 873 (citing *Carrillo*, 435 F.3d at 781). The focus is on what the defendant knew and whether that knowledge raises a reasonable inference that she remained deliberately ignorant of facts constituting criminal knowledge. *Carrillo*, 435 F.3d at 781. This case principally implicates the psychological branch of knowledge avoidance.

The ostrich instruction must be given cautiously so as not to allow a jury to convict a defendant for mere negligence, effectively eliminating the knowledge requirement. *Id.* This concern may be addressed by carefully considering whether the evidence supports an inference of deliberate avoidance. *See id.* at 782-84.

The government points to the following evidence in support of the ostrich instruction:

- Ramirez knew that virtually all her business came from Uribe, not from former customers or referrals;

- she knew that the persons referred by Uribe could not qualify for mortgages, yet sought 100% financing on the purchase price of the homes they wanted to buy;

- from April through mid-July 2005, Ramirez assisted seven bad-credit clients referred by Uribe in finding homes;

- she filled out the purchase contracts and then Uribe crossed out or whited out the buyers' names;

- Uribe told Ramirez that the changes in the contracts upset the title company, so she started sending him blank contract forms;

- in the seven transactions Ramirez received finalized contracts that listed the buyer as someone other than the person(s) to whom she had shown the house and who she knew would live in the house;

- Ramirez knew that Luis Gonzalez appeared as the purported buyer in three purchase transactions during a six-week period from mid-April through May 2005;

- she was aware that the properties would not be occupied by someone named Luis Gonzalez;

- she had never met anyone named Luis Gonzalez and did not know whether he was a real person;

- Ramirez attended three closings where Luis Gonzalez was named the buyer on the contracts;

- at those closings she witnessed Rafael Cruz sign the contracts in Gonzalez's name;

- Ramirez previously had sold Cruz a property, so she knew his name was not Gonzalez;

- she knew Cruz would not live in those homes;

- Ramirez admitted that by the third transaction she knew that Cruz was pretending to be someone he was not;

- nonetheless, she continued to associate with and participate in real estate transactions involving Uribe and Cruz;

- Ramirez asked Uribe how he was able to get so many mortgage applications using one person's identity, and he explained that as long as they closed the loans within thirty or sixty days, the credit reporting companies would not pick it up;

- Ramirez knew that Maria Moreno appeared as the purported buyer of two properties in purchase transactions dated three weeks apart in June and July 2005;

- Ramirez knew that Maria Moreno would not occupy these properties and she had never met anyone named Maria Moreno;

- Ramirez attended one closing for which Maria Moreno was the purported buyer and was present when Cruz's wife Juana Angelito signed the contract as Moreno;

- Ramirez knew Angelito and knew that she would not take possession of the property; and

- Ramirez's commissions quickly skyrocketed and she outpaced all of the other agents in her office based almost exclusively on transactions involving clients with bad credit who could not qualify for mortgages.

All of these circumstances suggest that Ramirez consciously turned a blind eye to the true nature of these transactions.

Yet there is even more evidence to support the district court's decision to give the ostrich instruction:

- in late 2004, Ramirez showed properties to Cruz and his wife, Angelito; when they found a home at 286 Chaparral, she asked him whose name the property would be in; and he said that it would not be in his or his wife's name and she should contact Uribe who would have that information;

- Uribe told Ramirez that he applied for the mortgage for 286 Chaparral using the identity

of Jorge Itoralde, and Cruz complained to her about how much he had to pay Itoralde to use his identity;

- Ramirez had received training on the importance of accuracy in drawing up sales contracts;

- she was aware that her boss Mary Roberts, who had greater experience and training, questioned the transactions with Uribe because they involved the same lender and same attorney;

- Ramirez claimed at trial that she believed the persons who signed as the buyers were "co-signers," yet none of the seven contracts identifies a "co-signer" and none contains the name of her buyer;

- she testified before the grand jury that she told Uribe that Gonzalez was buying properties so fast, she was embarrassed to show the contracts around her office;

- she also testified before the grand jury that the woman who lived with Cruz showed up at closings pretending to be someone else; and

- Ramirez's practices in filling out purchase contracts for transactions involving Uribe diverged from the typical process described by Roberts: Typically, the agent completes the purchase contract with the buyer, provides it to the seller or seller's agent and, only after

> the seller has approved the contract, forwards it to the lender. Ramirez, by contrast, provided partially completed or blank purchase contracts to Uribe who changed or filled in the buyer information and then returned the forms to Ramirez, apparently before she provided the forms to the seller's agent.

In deciding whether the evidence supports the ostrich instruction, we should consider all of these circumstances together because each of them was known to Ramirez. *See United States v. Conner*, 537 F.3d 480, 487 (5th Cir. 2008) ("Alone, each might not have justified a deliberate ignorance instruction, but when taken together they present facts that justify the instruction.").

Ramirez argues that the government presented evidence that she had direct knowledge of the scheme to defraud, but not a single piece of evidence of deliberate avoidance. However, evidence need not "be placed in either an actual knowledge category or a deliberate avoidance category." *Carrillo*, 435 F.3d at 784. The government may present evidence that supports both theories. *Id.* Much of the evidence described above supports both theories. Take, for example, Ramirez's own testimony that she saw Cruz in the room at the second Gonzalez closing and afterwards he called her, saying words to the effect of "I'm Cruz, or Luis Gonzalez, or whoever I'm supposed to be." This could support a finding that at that point in time Ramirez knowingly participated in the fraud. It also could support an inference of deliberate avoidance: If Ramirez was unaware of the fraudulent

scheme at that time, Cruz's presence at a closing that he seemingly had no reason to attend should have raised her suspicions. But she didn't question his presence. Ramirez's testimony about the third Gonzalez transaction presents another illustration of the dual nature of the information she possessed. She admitted that as of that point, she knew Cruz was posing as and signing for Gonzalez. This could support a finding that Ramirez knew she was participating in the scheme to defraud. It also could support a reasonable inference that Ramirez deliberately avoided discovering whether the person who signed for Maria Moreno at the two subsequent Moreno closings was in fact Maria Moreno. "A person's knowledge of his or her cohorts' involvement with illegal or suspicious activities is a fact we have consistently found significant in giving an ostrich instruction." *Carrillo*, 435 F.3d at 783.

Similar circumstances were presented in *United States v. Nguyen*, 493 F.3d 613 (5th Cir. 2007), where the court held that the ostrich instruction was warranted. The defendants, the Nguyen brothers, were involved in a mortgage scheme that used inflated appraisals, false documentation, and "straw borrowers" to obtain home financing loans. The Nguyens worked at a title company and acted as the notary, escrow, and closing agents for several real estate transactions which were part of the scheme. They completed and submitted forms to loan companies regarding bogus sales; they notarized straw borrowers' false affidavits stating their intent to occupy the homes; and they put cashier's check numbers on

forms showing a down payment was received, though they never saw the actual check or inquired about the check. *Id.* at 617. The Nguyens repeated these practices many times within a short time frame, and they often used the same straw borrowers. *Id.* at 618. The court concluded that the government had presented evidence sufficient to raise an inference of subjective knowledge. *Id.* at 620. The court said that participation in a single suspicious transaction might be insufficient to support the ostrich instruction, *id.* at 620, but explained that "[t]he sheer intensity and repetition in the pattern of suspicious activity coupled with the [defendants'] consistent failure to conduct further inquiry" did, *id.* at 622.

And so it was with Ramirez, who faced a similarly intense and repetitive pattern of highly suspicious activity. She knew that the clients Uribe referred to her could not qualify for mortgages yet sought 100% financing on the purchase price of the homes they wanted to buy. She provided Uribe with incomplete or blank purchase contracts. Every finalized contract she received from Uribe listed as the buyer someone other than the person with whom she had worked. Her buyers' names were nowhere to be found on the purchase contracts. Furthermore, Luis Gonzalez was the purported buyer for three purchases in a six-week period, and Maria Moreno was the purported buyer in two purchases in less than three weeks. Cruz even told her that he was taking on the Gonzalez persona, as needed. Ramirez knew that the persons who would occupy the homes were not on the contracts.

And there is even more: viewing the evidence in the light most favorable to the government, as we must, Ramirez attended three closings where she witnessed Rafael Cruz, whom she knew was not Gonzalez, sign the contracts as Luis Gonzalez, the purported buyer. Even accepting Ramirez's version of the facts, she attended two closings where she saw Cruz even though he had no legitimate reason to be there. She knew that Cruz was not the person to whom she had shown the houses and that he would not live in the houses. Ramirez even admitted that she attended the third Gonzalez closing at which time she understood Cruz was claiming to be Gonzalez! Yet she was quick to say that she never saw Cruz sign anything, which by itself could reasonably be understood as an effort to hide her head in the sand. The evidence thus reveals "a paradigm case" for giving an ostrich instruction: Ramirez acknowledges her association with Uribe and his cohorts, "but, despite circumstantial evidence to the contrary, denies knowledge of the group's illegal activity." *United States v. Paiz*, 905 F.2d 1014, 1022 (7th Cir. 1990), *abrogated on other grounds by Gozlon-Peretz v. United States*, 498 U.S. 395 (1991); *Diaz*, 864 F.2d at 550.

Yet Ramirez failed to ask questions—other than the one to Uribe about how he was able to use a name so many times—or take any other action. Uribe's response to her that credit reporting companies wouldn't pick it up if they acted quickly enough itself should have prompted further questions. But even if that by itself didn't heighten Ramirez's suspicions, when considered together with the other events as they unfolded—Ramirez questioned Uribe about this before any of the Gonzalez

closings—such a response would have made her strongly suspicious that things were not as they seemed to be. And the fact that Ramirez accepted Uribe's explanation that everything was fine, without question, further supports an inference that she deliberately hid her head in the sand to avoid learning the truth. *See United States v. Newell*, 315 F.3d 510, 528-29 (5th Cir. 2002) (holding ostrich instruction appropriate where principal in advertising agency accepted client's representations that charges were for legitimate marketing expenses without any proof that marketing-related expenses were incurred, hesitated in seeking legal advice, and persisted in questionable practices even after a coworker had questioned her about them).

We acknowledge that distinguishing between deliberate avoidance and simple lack of mental effort, lack of curiosity, ordinary ignorance, or mere negligence often involves "close calls." *See United States v. McClellan*, 165 F.3d 535, 549 (7th Cir. 1999). But in cases such as this, we should defer to the district court's exercise of discretion to give the ostrich instruction. *Id.* And this is so even in cases in which there is evidence of direct, or actual, knowledge. *See Carrillo*, 435 F.3d at 783-84 (finding no abuse of discretion in giving ostrich instruction where some evidence established direct knowledge and some evidence raised an inference of deliberate ignorance). Accordingly, we conclude the district court did not abuse its discretion by giving the ostrich instruction to the jury.

## B. Refusing to Include Negligence Language

Ramirez argues that the district court compounded its error in giving the ostrich instruction by failing to instruct the jury that mere negligence in discovering the truth was not sufficient to infer knowledge. Along those lines, she contends that the government suggested that the jury could find deliberate avoidance because a reasonable person in her position would have inquired further and discovered the truth.

We have cautioned that "a jury must not be invited to infer that a particular defendant deliberately avoided knowledge on the basis of evidence that only supports the inference that a reasonable person in the situation would have deliberately avoided knowledge." *Carrillo*, 435 F.3d at 782. In arguing that the government invited the jury to do that here, Ramirez first points to a single sentence in the government's closing argument: "Remember, there are so many red flags in each of these transactions that there's a high risk that an honest real estate broker, one who isn't intent on defrauding, will catch onto the scam, will turn Uribe in." We are not persuaded that this sentence has the effect that Ramirez attributes to it. There is little risk that this single line from the government's closing argument led the jury to find that Ramirez deliberately avoided knowledge because a reasonable broker would have inquired further and discovered the fraud. The context of this sentence seems to dispel any notion of juror confusion. The government was explaining why Uribe needed to enlist a real estate agent who was in on the fraudulent scheme—someone he could trust would not turn him in to authorities.

Furthermore, the government repeatedly stated in its closing argument that it had to prove that Ramirez acted knowingly or with knowledge. The Assistant U.S. Attorney accurately quoted the jury instruction on the elements of wire fraud that the jury was to receive immediately following the arguments, including "that the defendant *knowingly* devised or participated in the scheme to defraud, as described in the indictment" and "did so *knowingly* and *with the intent to defraud*." She added that "this case boils down to a single issue: Did Beatriz Ramirez *knowingly* participate in a scheme to fraudulently obtain mortgages?" The prosecutor reiterated that "the government must prove that the defendant *knowingly* participated . . . in a scheme to defraud." Moreover, government counsel accurately explained that "knowingly" as used in the instructions the court was to give to the jury meant "that the defendant realized what he or she was doing, was aware of the nature of his or her conduct, [and] did not act through ignorance, mistake or accident." The government's closing argument did not suggest that the jury could convict Ramirez because of her failure to do what a reasonable person in her situation would have done. Nor did the government's closing suggest that a guilty finding could be based on mere negligence.

Ramirez also argues that the government used Roberts' testimony to suggest that a reasonable broker would have seen the red flags in the transactions involving Uribe and inquired further. The government responds that it pointed to Roberts' testimony as evidence that Ramirez, who knew much more about the suspicious circum-

stances than Roberts did, actually knew of the fraud, not that Ramirez should have known about it. We have found that an ostrich instruction was appropriately given under similar circumstances. *See United States v. Leahy*, 464 F.3d 773, 796-97 (7th Cir. 2006) (contrasting defendant's claimed ignorance despite years of involvement with suspicious workers compensation insurance accounts with the reaction of a coworker, who immediately realized that the accounts were based on inaccurate employee job classifications), *cert. denied*, 128 S. Ct. 46 (2007). Roberts was somewhat alarmed after fielding a few phone calls for Ramirez while she was on vacation and briefly reviewing her files. Though Ramirez did not have the same level of experience as Roberts, Ramirez was deeply involved with the suspicious files and related transactions. They were her ticket to success.

As for the district court's refusal to instruct the jury that mere negligence in not discovering the truth could not be equated with knowledge, Ramirez contends that such language was supported by the evidence that she was a relatively new and inexperienced real estate agent and that she was trusting.[3] A variation provided by the Seventh Circuit pattern ostrich instruction indicates that "mere negligence" language should be included when

---

[3] In her brief Ramirez asserts that Roberts opined that she was trusting and naive. Actually, Ramirez's attorney said during a sidebar that Roberts would testify that Ramirez was naive and trusting. Roberts testified, however, that Ramirez was trusting and caring. We also note that Ramirez did not argue a negligence theory to the jury; her theory of defense was simply that she lacked guilty knowledge.

appropriate in a given case. Federal Criminal Jury Instructions of the Seventh Circuit 4.06 (1999) ("You may not conclude that the defendant had knowledge if he/she was merely negligent in not discovering the truth."). The district court's ostrich instruction did not include such language.

It seems unlikely that the jury could have found Ramirez guilty based on mere negligence, given the instructions as a whole made it clear that the government had to prove that she knowingly participated in the fraudulent scheme. *See Carrillo*, 269 F.3d at 770 (concluding it unlikely that the jury convicted the defendants based only on negligence given the instructions that "[a] defendant's presence at the scene of a crime and knowledge that a crime is being committed is not alone sufficient to establish the defendant's guilt" and "[a] defendant's association with conspirators . . . is not sufficient to prove his participation or membership in a conspiracy"); *Paiz*, 905 F.2d at 1022-23 (concluding ostrich instruction's effect was neutralized by other instructions including a "mere presence" instruction which "negate[d] any chance that the jury would convict . . . on any finding other than" knowing participation in the conspiracy). And, we add that we disagree that there was any evidence that Ramirez was merely negligent. She either knew or she actively and deliberately avoided learning the truth. Moreover, the government did not argue that Ramirez was guilty because she was negligent, or otherwise failed to do what a reasonable real estate agent would have done.

And other instructions cannot be disregarded. As noted, we consider not only the ostrich instruction but all of the instructions as a whole to determine if they adequately and correctly informed the jury of the applicable law. *See, e.g.*, *United States v. DiSantis*, 565 F.3d 354, 359 (7th Cir. 2009); *United States v. Curry*, 538 F.3d 718, 731 (7th Cir. 2008). The district court gave several other instructions regarding knowledge and intent:

> A scheme is a plan or course of action formed with the intent to accomplish some purpose. . . .
>
> A scheme to defraud is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the loss of money or property to another.
>
> The phrase "intent to defraud" means that the acts charged were done knowingly, with the intent to deceive or cheat the victim in order to cause gain of money or property to the defendant or loss of money or property to another.

The court further instructed that:

> Any person who knowingly aids, counsels, commands, or induces or procures the commission of an offense may be found guilty of that offense. A person must knowingly associate with the criminal activity, participate in the activity and try to make it succeed.
>
> If the defendant knowingly causes the acts of another, the defendant is responsible for those acts as though she personally committed them.

. . .

    If a defendant performs acts that advance a criminal activity, but had no knowledge that a crime was being committed or was about to be committed, those acts alone are not sufficient to establish the defendant's guilt.

This last instruction is analogous to the "mere presence" instruction discussed in *Carrillo*, 269 F.3d at 770, and *Paiz*, 905 F.2d at 1022-23. These instructions advised the jury that it had to find that Ramirez acted knowingly in order to be guilty. When we look to the instructions as a whole, we conclude that the jury was appropriately instructed that it could not convict absent a finding that Ramirez acted "knowingly." The absence of the "mere negligence" variation of the ostrich instruction does not seem to us to have been an error in this case.

## C.  Harmless Error

    As a backup position, the government also argues that even if the ostrich instruction was improperly given or worded, the error was harmless given the extensive evidence of Ramirez's direct knowledge, including her own repeated incriminating statements. We agree.[4]

---

[4] Ramirez contends, without any analysis or citation to pertinent authority, that the district court's giving of the ostrich instruction denied her due process. Such an argument is considered waived. *United States v. Tockes*, 530 F.3d 628, 633 (7th Cir. 2008).

Even if the district court erred in giving the ostrich instruction or in declining to include language advising the jury that mere negligence was insufficient for a guilty finding, Ramirez's conviction should be upheld if the error was harmless. *See Pope v. Illinois*, 481 U.S. 497, 501-03 (1987); *Black*, 530 F.3d at 602. An error is harmless "if the evidence is so strong that a jury would have reached the same verdict absent the erroneous instruction . . . ." *United States v. Ramsey*, 406 F.3d 426, 432 (7th Cir. 2005). The easiest case for harmless error in giving an ostrich instruction is where the defendant's own testimony establishes his or her knowledge of the criminal activity. *See United States v. Nobles*, 69 F.3d 172, 187 (7th Cir. 1995) (reasoning that the ostrich instruction was unlikely to affect the jury's consideration of the defendant's own words indicating knowledge of drug possession); *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir. 1985) (concluding the ostrich instruction was "completely harmless as to [one defendant], for there was direct evidence that he himself described the scotch as stolen").

Here, we have Ramirez's own testimony at trial which supports a finding that she knew, at the very least, by the third Gonzalez closing that Cruz was showing up at closings for which he was not the buyer, or, for that matter, the seller, was using a false name and false identity, and was posing as someone he was not. This is obviously false, deceptive, and illegal. Despite knowing that Cruz and Uribe were involved in these fraudulent activities, Ramirez's association with and participation

in the scheme continued. Ramirez's knowledge that Uribe, Cruz, and others were involved in fraudulent loan transactions, along with her knowledge of the numerous suspicious circumstances that surrounded those and other transactions gave her sufficient knowledge to permit a jury to infer that she remained deliberately ignorant of facts constituting criminal knowledge.

In arguing that the errors in the giving of the ostrich instruction were not harmless, Ramirez relies on the fact that Uribe did not mention her in his sworn statement prepared by the government, reviewed by Uribe and his attorney, and presented under oath to the grand jury regarding the scheme. Uribe testified, however, that he had told the government about Ramirez before he testified to the grand jury. He also testified that his statement to the grand jury did not contain every detail that he knew about the fraud. Ramirez responds that she was "hardly a mere detail." While this seems to be an accurate characterization of her role, Uribe's omission of any mention of Ramirez in his statement to the grand jury cannot be considered in isolation. We consider all of the evidence, and we find plenty of evidence of Ramirez's actual knowledge, including her own testimony on the stand that, even if she was in the dark in the beginning, by the third Gonzalez closing, at the latest, she knew of the criminal activity. We might add that the third Gonzalez closing, which Ramirez testified occurred in June 2005, occurred prior to the August 31, 2005 wire transfer, which served as the basis for Count 3—the count on which Ramirez was convicted.

Ramirez also focuses on Uribe's testimony that "it was my understanding, or my thought, that Ms. Ramirez may have—or did know about the scheme." She argues that, given the government's view that Uribe was the "head of the scheme" and she was only a helper, Uribe's testimony shows a "shocking lack of certitude." But Ramirez overlooks Uribe's testimony in response to the next two questions following this testimony:

Q: Did you tell the government whether the defendant knew of any other co-schemers or participants in this fraud?

A. At that time I believe I did, yes, ma'am.

Q. And what did you say?

A. I did at that time mention the fact that Ms. Ramirez had known and had met Mr. Rafael Cruz, who eventually posed as Luis Gonzalez for some of these properties.

It seems that rather than being unsure about whether Ramirez knew about the scheme, Uribe's word choices reflect discomfort in testifying. And, in the end, it doesn't really matter given the plentiful evidence that Ramirez knew about and knowingly participated in the fraudulent scheme. This was not a close case.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM Ramirez's conviction and the district court's judgment.