Filed 6/10/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| JOHN FARINA et al., | B294516 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC664052) |
| v. | |
| SAVWCL III, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge.  Affirmed.

Brown White & Osborn, Caleb E. Mason and Kenneth P. White for Plaintiffs and Appellants.

Marquis Aurbach Coffing, Chad F. Clement; Lewis Brisbois Bisgaard & Smith, Joseph C. Campo, Jeffry A. Miller and Ernest Slome for Defendants and Respondents.

————————————

A funnel hovered over the American West.  Into the large end went investor dollars and investor dreams.  Out the little end streamed dollars into Las Vegas, where a Nevada intermediary made loans to Nevada land developers who had high hopes for big projects.  The funnel channeled over $40 million in 2006 and 2007.  But remember what happened next:  the subprime meltdown.  The investors ended up getting back just 17 cents on the dollar.  They sued the developers.

The question is *where*.  Where can this suit proceed?  The answer is:  not in California.  The investors knew they were sending their dollars to Nevada—to Nevada residents who said they aimed to develop Nevada land.  The Nevada developers did not know where the investors lived.  Some investors lived in California, but the Nevada developers got money only from the Nevada intermediary, which is not in this suit and apparently now bankrupt.  So when unhappy investors sued the Nevada developers in a California trial court, that court quashed their case for want of personal jurisdiction over the all-Nevada defendants.  This ruling was right because you do not purposefully avail yourself of California benefits if you do not know your actions somehow connect to California.  We affirm.

I

The apparently-bankrupt Nevada intermediary was Aspen Financial Services, LLC (Aspen).  It has never been a party to this lawsuit, but it was in the middle of the money flow.  We describe its operation.

When it was solvent, Aspen was a hard money broker in Las Vegas, Nevada.  It raised money from individual investors and pooled the money into loans for property developers.  Many

2

investors funded a typical loan, with each investor owning a fraction of it.

Borrowers could get loans through Aspen faster and more easily than from banks because Aspen was not regulated like a bank. Thus, developers were willing to pay a premium to borrow through Aspen. In turn, investors who funded the loans got higher interest rates than from a bank deposit. Everyone prospered from the arrangement—during good times, anyway, when borrowers made their payments.

Aspen brokered two loans for West Charleston Lofts III, LLC (West Charleston), a Nevada real estate developer. Aspen made the first loan in 2006, for around $19 million. It made the second loan in 2007, for about $24 million. Over 500 investors funded the loans. The vast majority lived in Aspen's home state of Nevada, but about a tenth lived in California. Another 111 were from other states.

Promissory notes for the loans designated the individual investors, not Aspen, as the lenders. Each investor entered a loan servicing agreement with Aspen. This agreement made Aspen the investor's agent to service each note, to protect the lender's interest in and enforce the lender's rights under each note and, if necessary, to manage, refinance, or sell a property.

The investors gave the loans' principal to Aspen, which in turn gave it to West Charleston. Repayment from West Charleston to the investors also flowed through Aspen. The promissory notes provided West Charleston would make payments to Aspen's Las Vegas address. Once Aspen got the payments, it distributed them to the investors.

Aspen's founder and president, Jeffrey Guinn, testified he believed Aspen had a fiduciary duty to the investors. Guinn said Aspen owed no duty to borrower West Charleston.

West Charleston used the money from the loans to buy Nevada property for development. Deeds of trust for the property secured the promissory notes.

There were personal guarantees as well, so we expand our cast of characters. Christopher Stuhmer ran West Charleston. His wife was Michelle Stuhmer. Their trust was JCS Family #2 Trust. These individuals and their trust, as well as Christopher Homes, LLC, all gave personal guarantees for the loans to West Charleston. The personal guarantees required the Stuhmers, their trust, and Christopher Homes to repay the investors if West Charleston defaulted on the loans.

The first loan matured in October 2007, but West Charleston said it could not repay investors due to the then-unfolding recession. So Aspen gave West Charleston an extension. Over the next several years, Aspen gave West Charleston more loan extensions.

In May 2011, West Charleston's Christopher Stuhmer sent a letter to Aspen's Jeff Guinn. This letter plays a central role in this controversy. The investor plaintiffs say this letter was the linchpin of a fraud by Stuhmer to wriggle out of Stuhmer's family's personal loan guarantees and thus to trick the investors into accepting more risk.

Stuhmer's letter proposed the investors transform their loans into equity.

Stuhmer's proposal was that the investors convert their loans to West Charleston into equity in a new joint venture, led by Stuhmer, that would take over development of the property.

4

The joint venture would include (1) the Aspen investors, (2) a new investor to fund predevelopment holding costs and operating expenses, and (3) West Charleston, which would contribute the Nevada property it bought with the original loan funds. The Aspen investors would get 87 percent of equity in the joint venture and, in exchange, would relinquish their interest in the promissory notes, deeds of trust, and personal guarantees.

That last part about how the investors would relinquish their interests in Stuhmer's personal guarantees would assume dominating importance. The plaintiff investors in this suit would claim Stuhmer engineered this letter as a trick to escape his personal guarantees of the loans.

Guinn wrote the individual investors to explain the proposed joint venture. Guinn also included a copy of Stuhmer's letter. Most investors told Aspen they approved of the joint venture plan. So in January 2012, Aspen executed the Joint Venture Agreement as attorney-in-fact for the investors. The joint venture's name is SAVWCL III, LLC. We are unsure how to pronounce that, so we call it Joint Venture.

Under the Joint Venture Agreement, the investors canceled the promissory notes, deeds of trust, and personal guarantees. West Charleston conveyed its property to Joint Venture.

Joint Venture hired an architectural firm and a real estate consulting firm to work on the development. The firms worked for Joint Venture from their California offices. And Joint Venture paid the firms at their California offices. Ultimately, though, Joint Venture never developed the Nevada property.

In January 2016, Joint Venture sold the property and distributed the proceeds. It was a massive loss: the distributions returned 17 cents for each dollar the investors originally lent.

A dozen investors, including seven Californians, filed suit in Los Angeles Superior Court. We refer to plaintiffs as Investors. Investors named eight defendants:

- West Charleston, LLC, the Nevada company that originally borrowed the investors' money.
- Christopher Stuhmer, the Nevada resident who guaranteed the loans and ran West Charleston. Investors named Stuhmer individually and as trustee of JCS Family Trust #2, the Nevada trust that also guaranteed the loans.
- Michelle Stuhmer, spouse of Christopher Stuhmer and a Nevada resident who also guaranteed the loans.
- Christopher Homes, LLC, the Nevada company that also guaranteed the loans.
- SAVWCL III, LLC, the Nevada company we call Joint Venture.
- SAV Management, LLC, the Nevada company that served as trustee for the Nevada trust the investors created in tandem with Joint Venture.
- Christopher & Company, LLC, the Nevada company that was the operations manager for Joint Venture.
- Christopher Companies, LLC, the Nevada company Investors claim is an alter ego of Joint Venture and Christopher Stuhmer.

We refer to defendants collectively as Developers. Investors allege Aspen and Guinn conspired with Developers, but did not name either as defendants. Investors' complaint states Aspen and Guinn are in bankruptcy proceedings.

Investors asserted 11 causes of action, including fraud, breach of contract, and elder abuse. Investors claimed Stuhmer and his coconspirators lured Investors with false promises of personal guarantees, tricked Investors into converting debt to equity, and broke promises to repay the loans.

As mentioned above, the core of Investors' complaint is Stuhmer's May 2011 letter to Guinn. Investors claim Stuhmer directed Guinn to forward the letter to Investors. And Investors say Stuhmer and Guinn materially misled Investors by failing to inform them they could enforce the personal guarantees rather than approve the joint venture.

Developers moved to quash service for lack of personal jurisdiction. The trial court allowed jurisdictional discovery and requested supplemental briefing. It granted Developers' motion because it found Developers did not have the minimum contacts with California necessary to support jurisdiction.

## II

We first state the standard of review and then outline the principles of personal jurisdiction.

## A

When a defendant moves to quash service for lack of jurisdiction, the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence. (*Felix v. Bomoro Kommanditgesellschaft* (1987) 196 Cal.App.3d 106, 110.)

We defer to the trial court's factual findings that are supported by substantial evidence. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 (*Vons*), abrogated on other grounds by *Bristol-Myers Squibb Co. v. Superior Court* (2017) ___ U.S. ___, ___ [137 S.Ct. 1773, 1781] (*Bristol-Myers*).)

7

We independently review the trial court's application of law to facts. (*Vons, supra,* at p. 449.)

B

California courts may exercise jurisdiction on any basis consistent with the state or federal Constitution. (Code Civ. Proc., § 410.10.) Under those Constitutions, jurisdiction is proper if a defendant has minimum contacts with California such that a suit in the state does not offend traditional notions of fair play and substantial justice. (*International Shoe Co. v. State of Washington, etc,* (1945) 326 U.S. 310, 316; *Jayone Foods, Inc. v. Aekyung Industrial Co. Ltd.* (2019) 31 Cal.App.5th 543, 552.)

Personal jurisdiction can be all-purpose (also called "general") or case-linked (also called "specific"). (*Bristol-Myers, supra,* 137 S.Ct. at pp. 1779–1780.) (We use the more descriptive labels instead of the "general"/"specific" names.)

A court has all-purpose jurisdiction over defendants who are at home in the court's forum. All-purpose jurisdiction allows a court to hear any claim against a defendant, no matter where the underlying events happened. By contrast, in a forum where a defendant is *not* at home, a court may not exercise all-purpose jurisdiction, but may still exercise case-linked jurisdiction. Case-linked jurisdiction allows a court to adjudicate only those disputes relating to a defendant's contact with the forum. (See *Bristol-Myers, supra,* 137 S.Ct. at p. 1780.)

We address only case-linked jurisdiction, because Investors do not contend California courts have all-purpose jurisdiction over Developers.

To assess case-linked jurisdiction, courts apply a three-prong test. Case-linked jurisdiction exists where: (1) the defendant has purposefully availed itself of a forum's benefits; (2)

the controversy relates to or arises out of the defendant's contacts with the forum; and (3) the exercise of jurisdiction comports with fair play and substantial justice. (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269 (*Pavlovich*).) Here the dispute focuses on the first prong: whether Developers purposefully availed themselves of California's benefits.

A defendant *purposefully* avails itself of a forum's benefits if it intentionally directs its activities at a forum such that, by virtue of the benefits the defendant has received, it should reasonably expect to be haled into the forum's courts. (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 475–476 (*Burger King*).) By focusing on the defendant's purpose, this requirement ensures defendants will not be haled into a jurisdiction solely because fortuitous or attenuated contacts or because of the unilateral activity of another party. (*Id*. at p. 475.)

## III

The trial court correctly determined Investors did not carry their burden to establish jurisdiction. No evidence shows California has case-linked jurisdiction over Developers.

On appeal, Investors argue jurisdiction is proper because: (1) Developers "caused" Aspen to contact California investors; (2) Developers formed ongoing contractual relationships with California investors; and (3) Developers paid taxes to Nevada's Clark County Treasury Office in Los Angeles and retained California firms to work on the development. Investors also claim the trial court applied an erroneous legal rule.

Investors' arguments fail, for reasons we will explain. But first, we address a problem that recurs throughout Investors' arguments.

Investors often pinpoint a single defendant's action, and then extrapolate from it a conclusion about all eight defendant Developers. For instance, Investors write, "Respondents also purposefully availed themselves of California's benefits when [Joint Venture] sent, through Aspen, semi-annual assessment payments to Clark County's Treasury Office in Los Angeles." Yet even if *Joint Venture* purposefully availed itself of California benefits by sending payments to Los Angeles, it does not immediately follow, as Investors suggest, that *all* "Respondents also purposefully availed themselves of California's benefits." The flip side of this problem occurs when Investors make a broad statement about how Developers, as a whole, have contacted California, but then fail to support their statement by pointing to the actions of each of the eight defendants.

Personal jurisdiction is determined defendant by defendant: we assess each defendant's individual contacts with a forum to determine whether jurisdiction is proper as to it. (*Burdick v. Superior Court* (2015) 233 Cal.App.4th 8, 24.) Even when a plaintiff alleges conspiracy, as Investors do, the purposes and acts of one party cannot be imputed to others. (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 113.)

For that reason alone, Investors' arguments do not prove jurisdiction for several of the Developers. But Investors' arguments also fail independently, for the following reasons.

A

Investors contend jurisdiction is proper because Developers "caused" Aspen to contact California investors. Specifically, Investors claim Developers used Aspen to induce Investors into loans, repayment forbearances, and the joint venture proposal.

10

The actions of third parties, like Aspen, generally are irrelevant to whether defendants, like Developers, purposefully availed themselves of a forum's benefits.  (See *HealthMarkets, Inc. v. Superior Court* (2009) 171 Cal.App.4th 1160, 1169 (*HealthMarkets*).)  Only when a defendant purposefully directs a third party's activities toward the forum state can the actions of the third party be imputed to the defendant.  (*Ibid.*)  Thus, even when a third party is involved, the focus of our inquiry remains on the *defendant's* actions and intent.

Investors have not shown Developers purposefully directed Aspen's activities toward California.

Investors' claim that Developers directed Aspen's contacts mostly centers on one item of evidence:  the May 2011 letter Stuhmer sent to Aspen's Jeff Guinn, proposing the new joint venture, which Guinn forwarded to Investors.  The trial court called Stuhmer's letter the key piece of evidence purportedly tying Developers to Aspen.

Stuhmer's letter does not establish jurisdiction in California because the trial court found an *absence* of evidence Stuhmer (and his wife) knew any lenders were California residents.  Even if Stuhmer wanted Aspen to forward his letter to all investors—there is contradictory evidence about that—this fact would not prove Stuhmer intentionally directed Aspen's activities toward California.

To be sued in California for your business, you must intend that your business will benefit from California.  (See *Burger King*, *supra*, 471 U.S. at p. 474.)  Here, Developers did not know their business was connected to California.  The Stuhmers lacked this knowledge and purpose, so jurisdiction in California was improper.

11

Substantial evidence supports the trial court's finding Stuhmer and his wife did not know investors lived in California. Stuhmer declared he "had no knowledge of any of Aspen's investors, how many there were, where they resided, who they were, how much they had invested, where they invested from, and had no knowledge about anything about them at all."

Investors argue Developers "had constructive knowledge that Aspen's activities were directed towards California residents because Aspen was [Developers'] agent" and Aspen knew some investors lived in California. (See Civ. Code, § 2332 [providing an agent's knowledge is imputed to its principal].) But Investors' Loan Servicing Agreements provided Aspen was Investors' agent, not Developers'. Thus, we impute Aspen's knowledge to Investors, not Developers. Developers did not have constructive knowledge some investors lived in California.

Investors also claim "Mr. and Ms. Stuhmer had actual knowledge of the identities of all lenders listed on the loan and guaranty documents that the Stuhmers signed." The loan and guaranty documents signed by the Stuhmers list Investors' names only. Names do not reveal residences. No proof shows the Stuhmers knew where Investors lived.

Nor, as Investors argue, were Developers deliberately ignorant of Investors' location. Assuming for the sake of argument deliberate ignorance can suffice, there was none here. Deliberate ignorance is when you suspect a fact would be to your disadvantage if you learned it, so you take steps to avoid confirming your suspicion. (See *U.S. v. Black* (7th Cir. 2008) 530 F.3d 596, 604 (*Black*), vacated and remanded on other grounds in *Black v. U.S.* (2010) 561 U.S. 465; accord, Alexander Sarch, *Willful ignorance in law and morality* (2018) Philosophy Compass

12

<https://doi.org/10.1111/phc3.12490> [as of June 9, 2020], archived at <https://perma.cc/MQU6-L8JB>.)

The key is deliberately taking steps to avoid confirming your suspicion. That key creates "the distinction between willful ignorance and ordinary ignorance." (*Black*, *supra*, 530 F.3d at p. 604; see generally *U.S. v. Heredia* (9th Cir. 2007) 483 F.3d 913, 918–920.)

The stock reference invokes the ostrich's supposed proclivity, when encountering danger, to hide its head in the sand. Judge Posner decried this as "pure legend and a canard on a very distinguished bird. . . . It is too late, however, to correct this injustice." (*Black*, *supra*, 530 F.3d at p. 604.)

Investors cite no evidence Developers had definite suspicions about where Investors lived, or that they deliberately took steps to avoid confirming their suspicions. The Developers never said "No, do not tell me; I don't want to know" or anything like that.

There was no reason Developers should have known or cared where Investors were located. West Charleston received the loan principal from Aspen, not the individual investors, and paid interest to Aspen's Las Vegas office, not the individual investors.

On this record, there was no willful ignorance. There was just ignorance. The standard requires purpose, not ignorance. The trial court ruling was right.

Eventually, the Stuhmers received records from Aspen that included Investors' addresses. Investors say this occurred in 2011. They cite Guinn's deposition testimony. But, in fact, Guinn said, "we turned [records] over to [the] partnership before Aspen closed down, and I want to say June of 2013. So if it would

13

have closed down obviously before June of 2013, the partnership itself, Chris would have access to all the documents that Aspen had at the time because now they were all joint ventures with the investors." Stuhmer declared, "On May 30, 2013, [Aspen] turned over originals of its records relating to the [Joint Venture]."

Thus, the evidence suggests Developers learned of the lenders' residences years after Stuhmer's May 2011 letter, and long after the January 2012 formation of Joint Venture. All the actions Investors claim constitute purposeful availment— inducing California investors into loans, repayment forbearances, and the joint venture proposal—were before Developers received Investors' addresses in 2013.

Investors cite an inapposite precedent. They analogize their case to *Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770. In *Keeton*, there was jurisdiction over a libel action in a forum where the defendant publisher made "regular monthly sales of thousands of magazines." (*Id.* at pp. 773–774.) *Keeton* is nothing like this case. In *Keeton* it was "unquestionable" the defendant purposefully availed itself of the forum, and the court focused on whether jurisdiction was otherwise unfair. (*Ibid.*) Here, there is no evidence Developers intentionally directed activity toward California, by themselves or through Aspen. *Keeton* is irrelevant.

Because Developers did not direct Aspen's activities toward California, there is no jurisdiction in California.

### B

Investors argue California courts have jurisdiction because Developers created ongoing contractual relationships with California residents. This argument is incorrect. The contracts

14

between Investors and Developers do not show Developers purposefully availed themselves of California benefits.

A forum has jurisdiction over defendants who reach out and create continuing relationships and obligations with the forum's residents. (*Burger King*, *supra*, 471 U.S. at pp. 473, 475–476.) But the Supreme Court of the United States has explained a contract with a forum resident, alone, is insufficient to establish jurisdiction. (*Id.* at p. 478.) Courts must scrutinize the underlying business transaction—past negotiations, contemplated future consequences, contract terms, and the parties' actual course of dealing—to determine whether the defendant purposefully established minimum contacts with the forum. (*Id.* at p. 479.) Choice of law provisions are relevant to this inquiry. (See *id.* at pp. 481–482.)

This case is like *Goehring v. Superior Court* (1998) 62 Cal.App.4th 894 (*Goehring*), where a court found Texan defendants' contracts with a California company showed the defendants did not purposefully avail themselves of California benefits. In *Goehring*, the contracts between the Texan defendants and the California company consisted of a sales agreement, security agreement, escrow agreement, and six promissory notes with a California company. (*Id.* at pp. 902, 907.) Looking past the mere existence and number of contracts, the *Goehring* court focused on the contracts' terms and the parties' underlying business deal. (See *id.* at p. 907.) The court noted the contacts were governed by Texas law and were prepared by a Texas law firm. (*Ibid.*) The documents were executed in Texas and the payments necessary to close the transaction were made to a bank in Texas. (*Ibid.*) And the

15

contract concerned Texas-based payphones, so all future consequences were in Texas.  (*Ibid*.)

In this case, Developers and Investors entered a slew of contracts.  But, as in *Goehring*, the contracts only underscore that Developers did not purposefully avail themselves of California benefits.  Stuhmer executed the promissory notes in Nevada.  The notes have a Nevada choice of law provision.  They consent to the jurisdiction of Nevada courts.  They require repayment at Aspen's Nevada address.

The related deeds of trust also show the Developers did not purposefully avail themselves of California.  Stuhmer executed them in Nevada.  They have a Nevada choice of law provision.  They state the investors' addresses are in the care of Aspen at its Nevada address.  They transfer an interest in Nevada real property.

The personal guaranties also show the Developers did not purposefully avail themselves of California.  The personal guaranty for the 2006 loan has a Nevada choice of law provision.  Investors represent the "relevant provisions" of the guarantees for the 2006 and 2007 loans are identical.

The Joint Venture Agreement also shows the Developers did not purposefully avail themselves of California.  Aspen, as the attorney-in-fact for Investors, and West Charleston executed the Joint Venture Agreement in Nevada.  The agreement has a Nevada choice of law provision.  It also contains a forum-selection clause saying "Any action or arbitration, mediation or legal proceeding brought by any party to this Agreement . . . shall, unless otherwise required by law, be commenced in the courts of Clark County."  The Joint Venture Agreement requires notice to West Charleston at a Nevada address, West Charleston's lawyers

16

at a Nevada address, Aspen at a Nevada address, and Aspen's lawyers at a Nevada address.

The Amended Operating Agreement for Joint Venture also shows the Developers did not purposefully avail themselves of California. It contains a Nevada choice of law provision. It requires all disputes be settled by arbitration in Nevada.

Driving all these agreements was a plan to develop real estate in Nevada.

Investors again rely upon inapt decisions. Discussing these contracts, Investors cite *Jayone Foods, Inc. v. Aekyung Industrial Co. Ltd.*, *supra*, 31 Cal.App.5th at p, 559. In *Jayone*, a Korean manufacturer purposefully availed itself of California benefits by knowingly shipping "thousands of units of its products" through the Ports of Los Angeles and Long Beach to a distributor located in California. (*Id.* at pp. 556–557.) The Korean manufacturer communicated regularly with the California distributor by phone, e-mail, and purchase orders. (*Id.* at p. 557.) Representatives from the Korean manufacturer visited the distributor's California facility as well as a Los Angeles retail store where the representatives could see their products being sold. (*Ibid*.) All of this showed the manufacturer was intentionally participating in California's market, thus purposefully availing itself of California benefits. Investors' case is the opposite. Developers were intentionally participating in Nevada's market and in no other. The contracts highlight that point.

Developers did not purposefully avail themselves of California benefits through contracts with Investors.

### C

Investors argue jurisdiction is proper because Developers (1) paid taxes to Nevada's Clark County Treasury Office in

17

Los Angeles, and (2) retained California firms to work on the development.  The first argument fails on the facts and the second argument fails on the law.

1

Investors claim the Joint Venture "sent, through Aspen, semi-annual assessment payments to Clark County's Treasury Office in Los Angeles."  But as the trial court noted, Investors make this assertion by relying on a declaration the declarant later recanted.  Indeed, the declarant initially said Joint Venture made payments to Clark County's Los Angeles Treasury office only because Investors' counsel "intentionally misled" her.  The evidence supports the trial court's implicit finding that Joint Venture did not send payments to Clark County's Los Angeles Treasury office.  (See *HealthMarkets*, *supra*, 171 Cal.App.4th at p. 1168 [noting a trial court's "implied factual findings" are reviewed for substantial evidence].)

2

Investors' second claim is that Joint Venture retained California firms to work on the development.  This claim is factually accurate but legally irrelevant.

Joint Venture hired KTGY, an architecture firm, and John Burns Real Estate Consulting.  KTGY and John Burns worked for Joint Venture from their California offices, and Joint Venture paid the firms at their California offices.  Developers purposefully availed themselves of California benefits through these contacts.  However, the contacts do not relate to Investors' claims.  For a court to exercise case-linked jurisdiction over a claim, the claim must arise out of or relate to the defendant's contacts with the forum.  (*Pavlovich*, *supra*, 29 Cal.4th at p. 269.)

18

Investors' attempt to link their claims to Joint Venture's hiring of California firms is unsuccessful. Investors argue Developers "entered into contracts and paid John Burns and KTGY paltry sums on development studies to create the impression of development work in furtherance of their scheme to take [Investors'] loan funds." Yet the record contains no evidence Joint Venture told Investors it hired John Burns or KTGY. No evidence shows Investors knew John Burns or KTGY existed before Investors filed their lawsuit. Developers raise this point in their brief and Investors do not address it on reply. That is a concession.

Because Investors' claims do not arise out of or relate to Joint Venture's retention of California firms, jurisdiction does not exist.

D

Investors argue the trial court applied an erroneous version of the purposeful availment standard. The point is irrelevant because we independently apply law to facts. (*Vons*, *supra*, 14 Cal.4th at p. 449, abrogated on other grounds by *Bristol-Myers*, *supra*, 137 S.Ct. at p. 1781.) Our independent analysis shows jurisdiction is improper.

IV

The Supreme Court has emphasized the burden on the defendant is the primary concern when assessing case-linked jurisdiction. (*Bristol-Myers*, *supra*, 137 S.Ct. at p. 1780.) That burden encompasses not only the practical problems of litigating in a foreign forum, but also "the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question." (*Ibid*.)

Federalism is the byword.  (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 292–294.)  Personal jurisdiction ensures states, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.  (*Id.* at p. 294.)

Here those limits are controlling.

This case fundamentally centers in Nevada.  Through a Nevada intermediary that is not in the case, some Californians chose to invest in Nevada developers that were developing Nevada land.  The Californians joined with many other people from other states, but most of the investors were from Nevada.  The Nevada developers dealt with the Nevada intermediary and did not know money came from California.

California courts do not have jurisdiction over this Nevada case.

## DISPOSITION

We affirm the judgment and award costs to the Respondents.



WILEY, J.


We concur:



GRIMES, Acting P. J.



STRATTON, J.